## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JULIAN MARQUEZ, | ) | 3:19-CV-00962 (SVN) |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL DOUGHERTY, | ) | |
| *Respondent*. | ) | September 26, 2022 |

## RULING AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

Sarala V. Nagala, United States District Judge.

Petitioner Julian Marquez, who is presently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall-Walker"), has filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that his right to due process under the Fourteenth Amendment to the U.S. Constitution was violated during the criminal trial that resulted in his January 2006 conviction for felony murder, robbery, and attempt to commit robbery. Specifically, Petitioner alleges that his due process rights were violated by the state trial court's denial of his motion to suppress two eyewitness identifications and by the prosecution's failure to disclose material exculpatory evidence. Respondent Daniel Dougherty,[1] the Warden of MacDougall-Walker, asserts that the petition should be denied because the determinations that the Connecticut Supreme Court made when it affirmed Petitioner's conviction in 2009, and when it denied Petitioner's state habeas petition in 2019, were not contrary to, or an unreasonable application of, clearly established federal law. For the reasons described below, the Court agrees with Respondent. Accordingly, the petition is DENIED.

---

[1] At the time Petitioner filed his petition, Kristine Barone was the Warden of MacDougall-Walker. In 2022, Daniel Dougherty became the Warden of MacDougall-Walker and thus replaces Barone as the respondent in this action. *See* Fed. R. Civ. P. 25(d).

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

On January 11, 2006, Petitioner was convicted of felony murder pursuant to Connecticut General Statutes § 53a-54c, two counts of robbery in the first degree pursuant to Connecticut General Statutes § 53a-134(a)(2), and attempt to commit robbery pursuant to Connecticut General Statutes §§ 53a-49 and 53a-134(a)(2). Petition ("Pet."), ECF No. 1, at 2. The conviction stemmed from a robbery that took place on the evening of December 19, 2003. *See State v. Marquez*, 967 A.2d 56, 61 (Conn. 2009). On that evening, Mark Clement and Christopher Valle were visiting their mutual friend, Miguel Delgado, Jr., at Delgado's apartment in Hartford, Connecticut. *Id.* At around midnight, two men entered the apartment, announced their presence, and robbed Clement, Valle, and Delgado. *Id.* at 62. During a struggle with the intruders, Delgado was fatally shot. *Id.*

Four days later, while making a regular visit to his parole officer, Valle recognized Petitioner as the gunman who had robbed him. *Id.* Valle reported this observation to the parole officer, who conveyed it to the detective who was investigating the homicide. *Id.* That detective asked Valle to view a photographic array. *Id.* Prior to having him look at the photographic array, the detective instructed Valle "simply to look at the photographs and tell her if he recognized anyone, and that it was fine if he did not." *Id.* Consistent with these instructions, there was a notice printed at the bottom of the array that informed Valle that he was not obligated to identify anyone from the array, among other things. *Id.* The photographic array was not performed sequentially. Valle immediately selected Petitioner's photograph, noting that he was "sure that the individual pictured was the gunman." *Id.*

---

[2] The Court draws factual background from the Connecticut Supreme Court's 2009 decision affirming Petitioner's conviction, and from the Connecticut Supreme Court's 2019 decision denying Petitioner's state habeas petition. The facts set forth in these decisions are not a subject of dispute with respect to the pending petition.

A few days later, the detective requested that Clement view the same photographic array. *Id.*  The police followed an almost identical, non-sequential procedure with Clement, and either read aloud or pointed out the same prominent notice at the bottom of the array.  *Id.*  Clement "believed that the array contained photographs of known robbers but did not know if photographs of either of the persons who had robbed him would be included in the display." *Id.*  Although neither of the detectives present pressured him to select a photo, he felt that a suspect was probably in the array and that he should "pick somebody." *Id.*  Clement "found himself drawn to one photograph but was concerned about speaking up too quickly and identifying the wrong person." *Id.*  He eliminated all but two of the photographs and kept "returning to the photograph that originally had garnered his attention," paying particular attention to the eyes of the person in the photo.  Clement ultimately identified Petitioner's photograph, and the detective informed him that he had "done well" because he had chosen the same photograph as Valle.  *Id.*

After being identified by Valle and Clement as the gunman involved in the robbery, Petitioner was charged with one count of felony murder, three counts of robbery in the first degree, and one count of attempt to commit robbery in the first degree.  *Id.* at 62–63.  Following his arrest, Petitioner gave a statement to the police, blaming Delgado's murder on another individual named Edwin Soler.  *Marquez v. Comm'r of Corr.*, 198 A.3d 562, 566 (Conn. 2019).  Soler was later arrested and charged with the same offenses as Petitioner.  *Id.*

At his criminal trial, Petitioner moved to suppress any pretrial identifications or in-court identifications offered by the State, arguing that the identification procedures the police used were unnecessarily suggestive and unreliable and that any in-court identifications by Valle and Clement would be irreparably tainted by the improper pretrial identifications.  *Marquez*, 967 A.2d at 63. The trial court held a suppression hearing and considered scientific articles and reports regarding

the suggestiveness and reliability of identification methods. *Id.* at 64. The trial court then denied

Petitioner's motion to suppress, finding that, although the identification procedures were

unnecessarily suggestive, they were nonetheless sufficiently reliable under the totality of the

circumstances to be admissible at trial. *Id.*; *State v. Marquez*, No. CR03576603T, 2006 WL

224324 (Conn. Super. Ct. Jan. 4, 2006), *aff'd*, 967 A.2d 56 (2009). Accordingly, the State was

permitted to offer evidence and testimony regarding the eyewitness identifications.

In addition to evidence regarding the eyewitness identifications, the State also offered

testimony from Soler at Petitioner's trial. *Marquez*, 198 A.3d at 566. As recounted by the

Connecticut Supreme Court, Soler's testimony, and a subsequent colloquy between counsel and

the state trial court, proceeded as follows:

> Soler's account of the incident in question was largely similar to Valle's and
> Clement's testimony describing the incident, and Soler testified that the petitioner
> was the gunman. He also testified that during a chance encounter at the prison
> medical unit, the petitioner asked Soler to recant the statement he had already given
> to the police about the incident. Soler also testified that the petitioner questioned
> him about whether he would testify against the petitioner at his trial.
>
> On direct examination, the prosecutor asked Soler if he had been promised any
> benefits from the state in exchange for his testimony, which Soler denied. When
> prodded on cross-examination about his motivation for testifying, Soler stated:
> "I'm testifying cuz it's the right thing to do." Soler further stated that he was not
> offered any particular deal by the state and that he did not know whether he would
> receive any kind of consideration as a result of testifying. Soler also testified that
> he would not lie about the events of the night in question in order to benefit himself.
>
> Following Soler's testimony, and outside the presence of Soler and the jury, defense
> counsel requested that the court inquire of the state, on the record, if there were any
> discussions relayed to Soler about his cooperation being brought to his sentencing
> court's attention. Specifically, defense counsel questioned whether Soler was told
> that the felony murder charge would be dropped if he were to testify in accordance
> with the facts that existed.
>
> In response, the prosecutor explained that, because Soler testified at trial, "some
> credit perhaps would be due him. What the extent of that credit is, I don't know. I
> know counsel has suggested that perhaps I would reduce the charge. We've had
> discussions that maybe that would happen. I can't say that it would. In my

discussions with [Soler], I've indicated to him that I hadn't made any promises to him, so we have not come to a disposition or an understanding as to what any testimony would be. . . . [His testimony] potentially ultimately would be presented to a sentencing judge . . . . I don't see how that would not happen."

The court responded by stating that "some favorable consideration is something that [the state] would certainly consider at some point in time, but no promises have been made."  The prosecutor replied, "[r]ight."  The prosecutor further explained that "[the petitioner] was deciding to elect trial, so essentially for [Soler], we sort of tabled his case because he was available and willing to participate in [the petitioner's] trial."  When defense counsel questioned whether Soler's testimony would mean that "his charges could be lowered and he would not face a mandatory minimum of twenty-five years," the prosecutor responded by stating that, "I've not conveyed that to him . . . my conversations with him were that there are no offers on the table. . . . [H]ow this works out is still yet to be determined."

Soler's defense attorney then stated:  "We have discussed the possibility of there being a benefit.  We had at one point, I believe, discussed the possibility of coming down to twenty-five years if a variety of things fell into place.  I do not believe that I've ever indicated to my client that I had received an offer because there has never been an offer from the state in this case or an indication from the state that they would be inclined to drop the charge . . . ."

The court summarized:  "[T]here's been no fixed offer.  And that's the way it should be characterized . . . . It doesn't rise to the level of a promise.  It's not a promise."  The prosecutor affirmed her understanding that, if benefits had been offered in exchange for testimony, the state would have been obligated to disclose such information.  The court, therefore, accepted the prosecutor's representation that no agreement existed.

*Id.* at 567–68 (alterations in original).

The Connecticut Supreme Court also described Petitioner's defense counsel's closing argument:

Defense counsel argued to the jury in closing that the victims who had identified the petitioner likely chose the petitioner's photograph from the array because his photograph, which was the only one with a white ruler and bright lighting, stood out from other photographs presented to the victims.  Defense counsel also asserted that the petitioner's statement to the police was not reliable because he was pressed into giving a statement when the police confronted him with the prior, allegedly tainted identifications by the victims.  As for Soler, defense counsel specifically argued that he was likely looking for a deal in exchange for his testimony, telling the jury that Soler was involved and has "been around the block, he has a lot to lose, and he knows that what he could do is he can get off felony murder, not get

the twenty-five year mandatory minimum if he comes in here and he says what the state wants him to say and, anyway, he can say it." . . . Lastly, defense counsel critiqued the ability of the victims to recall certain events during the robbery and the thoroughness of the police investigation.

*Id.* at 569 (citations omitted).

At the conclusion of trial, the jury found Petitioner guilty of felony murder, two counts of robbery, and attempted robbery. *Marquez*, 967 A.2d at 65. The trial court sentenced Petitioner to fifty years' imprisonment, suspended after thirty-five years, followed by five years of probation. *See id.* at 65–66; Pet. at 2. Petitioner appealed his conviction to the Connecticut Supreme Court, where he argued that the trial court's denial of his motion to suppress the eyewitness identifications of Valle and Clement violated his right to due process under both the Fourteenth Amendment to the U.S. Constitution and Article First, § 8 of the Connecticut Constitution. *Marquez*, 967 A.2d at 85. On April 14, 2009, the Connecticut Supreme Court affirmed the trial court's judgment, concluding that "the [identification] procedures employed in this case, although not ideal, were within the acceptable parameters of effective and fair police work, and satisfy the requirements of due process." *Id.* at 85. Petitioner then filed a petition for writ of certiorari with the U.S. Supreme Court, which was denied on October 5, 2009. *Marquez v. Connecticut*, 558 U.S. 895 (2009).

On December 28, 2009, Petitioner filed a habeas petition in Connecticut state court, which he withdrew in June of 2012. On October 9, 2012, Petitioner filed a second habeas petition in state court. Application for Writ of Habeas Corpus, *Marquez v. Warden, State Prison*, No. TSR-CV-13-4005087-S (Conn. Super. Ct. Oct. 12, 2009); *see* Pet. at 6–7. The state habeas court denied this second petition on June 3, 2015. *See Marquez v. Warden, State Prison*, No. TSRCV134005087S, 2015 WL 4098138 (Conn. Super. Ct. June 3, 2015). Petitioner appealed the habeas court's decision, and the Connecticut Appellate Court dismissed the appeal on January 10, 2017. *Marquez v. Comm'r of Corr.*, 154 A.3d 73 (Conn. App. Ct. 2017). The Connecticut

Supreme Court then granted Petitioner's petition for certification for appeal on March 1, 2017. *Marquez v. Comm'r of Corr.*, 155 A.3d 1269 (Conn. 2017).

On appeal of his second state habeas petition before the Connecticut Supreme Court, Petitioner argued that the State had a leniency agreement with Soler that it had not disclosed to Petitioner in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and the Fourteenth Amendment to the U.S. Constitution. *Marquez*, 198 A.3d at 564–65. On January 15, 2019, the Connecticut Supreme Court affirmed the judgment of the Appellate Court. *Marquez*, 198 A.3d 562. In doing so, the court declined to consider whether the State in fact had a leniency agreement with Soler. *Id.* at 565. Instead, the Connecticut Supreme Court concluded that, even assuming such an agreement was struck, there was "no reasonable likelihood that disclosure of the agreement would have affected the judgment of the jury" in Petitioner's criminal trial. *Id.* The court therefore concluded that there was no due process violation because any failure to disclose was immaterial under *Brady*. *Id.*

On June 20, 2019, Petitioner filed his federal habeas petition in this Court pursuant to 28 U.S.C. § 2254. The petition asserts that Petitioner's due process rights were violated by the trial court's denial of his motion to suppress the eyewitness identifications of Valle and Clement, and by the State's purported failure to disclose a leniency agreement with Soler. Pet. at 9–13. After Respondent filed a response to the petition, the Court appointed *pro bono* counsel to represent Petitioner. ECF No. 29. Petitioner's counsel filed a habeas traverse that focuses predominantly on the purported suppression of a leniency agreement between Soler and the State, but did not brief the eyewitness identification issues. ECF No. 36.

## II.    LEGAL STANDARD GOVERNING HABEAS PETITIONS BROUGHT PURSUANT TO 28 U.S.C. § 2254

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When a habeas petitioner seeks to challenge the state court's legal conclusions, § 2254(d)(1) provides two distinct avenues for federal habeas relief. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). First, a petitioner may obtain federal habeas relief if the state court decision was "contrary to" clearly established federal law—for example, "if the state court applies a rule that contradicts the governing law set forth" by the U.S. Supreme Court, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the U.S. Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Id.* at 405–06 (emphasis added). *See also Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002) ("A decision is 'contrary to' clearly established federal law as determined by the Supreme Court 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" (quoting *Williams*, 529 U.S. at 412)).

Second, a petitioner may obtain federal habeas relief if the state court decision "correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts of a particular petitioner's case[.]" *Williams*, 529 U.S. at 407–08. "In order for a state court's decision to be an unreasonable application of [the U.S. Supreme Court's] law, the ruling must be objectively unreasonable, not merely wrong. . . . In other words, a litigant must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended

in existing law beyond any possibility of fairminded disagreement." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (citations and internal quotation marks omitted).

To determine whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law, the federal habeas court must first define the relevant federal law. *See Kennaugh*, 289 F.3d at 42 ("The threshold inquiry under [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)] is whether the petitioner 'seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.'" (quoting *Williams*, 529 U.S. at 390)). "For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the U.S. Supreme Court] refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 412). Clearly established federal law, "as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh*, 289 F.3d at 42.

The standard for federal habeas relief under § 2254 is "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citation and internal quotation marks omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and internal quotation marks omitted).

### III.   FIRST CLAIM:  PRETRIAL IDENTIFICATIONS

Although the petition asserts that the trial court's denial of Petitioner's motion to suppress the eyewitness identifications of Valle and Clement violated his due process rights, Petitioner has not briefed this claim.  Instead, Petitioner states in a footnote that he "rests on the arguments made in his Petition with respect to this issue before this Court, and expressly preserves it for future proceedings as needed."  ECF No. 36 at 4 n.1.  At oral argument, Petitioner's counsel did not provide a clear answer as to whether Petitioner was continuing to pursue this claim.  To the extent Petitioner has not abandoned his claim regarding the constitutionality of the identification procedures employed in this case, the petition is denied with respect to this claim.

### A.  Legal Standard

The U.S. Supreme Court has identified "reliability" as "the linchpin in determining the admissibility of identification testimony."  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *see also Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) (noting that "fundamental fairness" requires that "identification testimony be reliable").  When examining whether an identification procedure violated due process, a court must:  (1) "determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator"; and, if so, (2) "determine whether the identification was nonetheless independently reliable."  *Raheem*, 257 F.3d at 133.  If the procedures were not suggestive, then "the identification evidence presents no due process obstacle to admissibility, no further inquiry by the court is required, and '[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury.'"  *Id.* (alteration in original) (citations omitted).  If the court finds, however, that the procedures were suggestive, then it must determine whether the identification was nonetheless independently reliable.  *Id.*

"In general, a pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Jarrett v. Headley*, 802 F.2d 34, 40–41 (2d Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  The fairness of a photographic array depends on a number of factors, including "the size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990).  Police behavior can matter, too:  if the police indicate to a witness that they have "other evidence that one of the persons pictured committed the crime," *Simmons*, 390 U.S. at 383, or use "suggestive methods [to] transform a selection that was only tentative into one that is positively certain," the chance of misidentification increases, *Raheem*, 257 F.3d at 135.

If the pretrial process is unduly suggestive, the court must then weigh the "corrupting effect of the suggestive[ness]" against other factors that may demonstrate the identification could be independently reliable.  *Raheem*, 257 F.3d at 135 (alteration in original) (citing *Manson*, 432 U.S. at 114).  In determining whether a witness's in-court identification has reliability independent of unduly suggestive identification procedures, courts generally take into account:  (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).  Notably, "a good or poor rating with respect to any one of these factors will generally not be dispositive," *Raheem*, 257 F.3d at 135, and the question of independent reliability must be assessed in light of the totality of the circumstances, *Biggers*, 409 U.S. at 199; *see Manson*, 432 U.S. at 113; *Raheem*, 257 F.3d at 135.

Importantly, "[t]he determination of whether an identification procedure violates due process is governed by an extraordinarily general standard that hews closely to the facts of a particular case and turns on a court's judgment in evaluating those facts." *Brisco v. Ercole*, 565 F.3d 80, 90 (2d Cir. 2009) (citing *Simmons*, 390 U.S. at 384). The Supreme Court has held that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough*, 541 U.S. at 653. Thus, state courts are "entitled to significant 'leeway'" when a federal court reviews the state court's determination of whether an identification procedure violates due process. *Brisco*, 565 F.3d at 90.

### B. Discussion

Petitioner claims that the photographic identification procedures that the police used with Valle and Clement were improper for three reasons:  first, the witnesses were shown the photographs simultaneously, rather than sequentially; second, the lead investigator in the case administered the identification procedures; and third, the lead investigator demonstrated bias by telling Clement that he had chosen the same photograph Valle selected (which depicted Petitioner). Petitioner asserts that the trial court violated his Fourteenth Amendment rights by denying his motion to suppress the eyewitness identifications despite these purported improprieties. In its 2009 decision affirming Petitioner's conviction, the Connecticut Supreme Court addressed each of Petitioner's arguments and ultimately found that the identification procedures, while not ideal, were not unnecessarily suggestive. For the reasons below, the Court cannot conclude that the Connecticut Supreme Court's determination was contrary to, or an unreasonable application of, clearly established federal law.

In its 2009 decision, the Connecticut Supreme Court appropriately invoked the two-step analysis set forth in *Manson*, 432 U.S. at 107, noting that it must first address whether the

identification procedure was unnecessarily suggestive and, if it was, determine whether the identification was nevertheless reliable based on examination of the totality of the circumstances. *Marquez*, 967 A.2d at 69. Then, citing *Biggers* and *Simmons*, the court recognized the need to avoid "a very substantial likelihood of irreparable misidentification." *Id.* at 70. The court set forth a two-factor test for analyzing whether photographic identification procedures are unnecessarily suggestive: (1) examination of the composition of the photographic array itself, including "whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect"; and (2) examination of the actions of law enforcement, to determine if "the witness' attention was directed to a suspect because of police conduct," either through construction of the array or through verbal or physical cues of the officer. *Id.* at 70–71 (cleaned up). The court concluded that "any analysis of unnecessary suggestiveness must be conducted in light of the totality of the circumstances." *Id.* at 81.

This rule does not contradict clearly established federal law. Rather, the Connecticut Supreme Court applied *Manson* and looked to factors related to the appearance of the photographs in the arrays presented to Valle and Clement, as well as the police's presentation of the photographs. In applying the holdings of *Manson*, *Biggers*, *Simmons*, and their progeny to photographic arrays, the Second Circuit has likewise looked to factors including the size of the array, the manner of presentation, and the array's contents. *See Maldonado-Rivera*, 922 F.2d at 974. Accordingly, the Court cannot find that the Connecticut Supreme Court applied a rule inconsistent with federal law.

Nor can this Court find that the Connecticut Supreme Court unreasonably applied federal law. In reaching its decision that the police's identification procedures were not unnecessarily suggestive, the Connecticut Supreme Court considered each of the arguments Petitioner raises in

his petition with respect to this claim.  First, the court extensively reviewed the scientific literature Petitioner relied upon and concluded that the scientific opinion on the topic of eyewitness identification procedures is "far from universal or even well established," and that "the research is in great flux."  *Marquez*, 967 A.2d at 77.  The court held that "until the scientific research produces more definitive answers with respect to the effects of various procedures, '[d]ue process does not require the suppression of a photographic identification that is not the product of a double-blind, sequential procedure.'"  *Id.* at 78 (alteration in original).

The court then looked to the specific procedures employed in this case to determine whether they were unnecessarily suggestive.  *Id.* at 78–83.  In doing so, the court found significant that the photographic arrays shown to the witnesses contained a "conspicuous 'might or might not be present' warning, indicating to each witness that the perpetrator was not necessarily among those pictured and that the witnesses should not feel obligated to choose someone."  *Id.* at 81–82.  The court stated that the "presence of such a warning is a consistent recommendation of the scientific literature that we have reviewed and is deemed to counteract effectively the tendency of witnesses to use relative judgment."  *Id.* at 82.

The court then discussed the testimony provided by both Clement and Valle.  The court noted that Clement testified that "he remembered that [the lead investigator] had read him the warning before he viewed the photographic array," that "the detectives did nothing to influence his decision or to direct his attention to any particular photograph," and that "he selected the defendant's photograph from the array solely on the basis of his 'gut feeling.'"  *Id.*  The court further noted that the trial court credited Clement's testimony that "he was not at all sure that the true perpetrator would be in the array," and it discussed the trial court's observation that, "although [Clement] believed that the police would not have invited him to view photo[graphs] if they did

not at least have a suspect in mind, he was not at all sure that the true perpetrator would be in the array, and so he commendably took his time in order not to implicate an innocent man." *Id.* (alterations in original). The court also discussed how, although Valle testified that he did not remember the "might or might not be present" warning, his identification was unique because he originally reported spotting Petitioner at his parole office, and it was this information that led to the inclusion of Petitioner's photograph in the photographic array in the first place. *Id.* The court concluded that, given Valle's chance encounter with Petitioner at the parole office and his immediate selection of Petitioner from the array, it was "clear that Valle's selection of [Petitioner's] photograph was not influenced by relative judgment because he simply did not have the time or the need to engage in a process of elimination." *Id.* at 83.

In addition, the court reasoned that "the failure to use a double-blind procedure does not automatically render an identification suspect, particularly when, as in the present case, there is no evidence that the detectives conducting the procedure influenced the witnesses in any discernible way prior to their making the identification." *Id.* The court specifically addressed the lead investigator's statement to Clement that he "did good because that was the same guy [Valle] picked." *Id.* at 79, 83. Although the court disapproved of this statement, *see id.* at 83 n.39, the court found that when a police officer tells a victim that he has identified the suspect *after* the victim has already positively identified the defendant as his or her assailant, this does not render the identification procedure unnecessarily suggestive. *Id.* at 83 (alteration in original). Accordingly, the court concluded that, "although [the police officer's] comment to Clement may affect the weight or even the admissibility of a subsequent *in-court* identification, it is irrelevant to our analysis regarding the suggestiveness of the procedure itself." *Id.*

Ultimately, the Connecticut Supreme Court held that the identification procedures were not "so flawed as to present 'a very substantial likelihood of irreparable misidentification.'" *Id.* The court stated that "[t]he detectives employed traditional procedures and proceeded in a neutral fashion," and that there was "no evidence that they attempted to influence, consciously or subconsciously, the outcome of the identification process, and the witnesses' testimony bears this out." *Id.* The court emphasized the warnings provided with the photographic arrays and indicated that "[t]he photographic arrays themselves were not designed or presented in an unfair or suggestive manner." *Id.* Accordingly, the court held that "the procedures employed in this case, although not ideal, were within the acceptable parameters of effective and fair police work, and satisfy the requirements of due process." *Id.*

In assessing whether the Connecticut Supreme Court's conclusion was an unreasonable application of clearly established federal law, this Court begins by noting that it is not aware of any controlling federal authority published in or before 2009 holding that simultaneous, non-double-blind procedures are *per se* unreasonable. Indeed, in more recent years, the Second Circuit has recognized the absence of any "binding precedent seriously question[ing] the use of simultaneous photo arrays." *United States v. Harris*, 598 F. App'x 44, 44–45 (2d Cir. 2015); *see also United States v. Schaffer*, No. 12-CR-430 ARR, 2014 WL 1515799, at *7 (E.D.N.Y. Apr. 18, 2014), *aff'd*, 851 F.3d 166 (2d Cir. 2017) ("Given that courts in this circuit have repeatedly found photo arrays involving more than one photograph simultaneously displayed on a single page not to be unduly suggestive, the court finds that the simultaneous presentation of a photo array is not considered inherently suggestive under the law applicable in this circuit."). Likewise, courts in this Circuit have declined to invalidate identification procedures because they were not double blind. *See Schaffer*, 2014 WL 1515799, at *7 (rejecting argument that pretrial photo arrays were

improperly suggestive because they "were not doubleblind"); *see also Tubbins v. Wrest*, No. 14-CV-00409A(F), 2016 WL 5919838, at *5 (W.D.N.Y. Oct. 11, 2016), *report and recommendation adopted*, No. 14-CV-409A, 2016 WL 7117256 (W.D.N.Y. Dec. 7, 2016) (declining to find that indictment was improperly obtained based on the plaintiff's argument that "after Plaintiff was exonerated by . . . DNA evidence, [the police department] changed their photo array procedure to 'double blind' photo arrays"). Thus, it was not an unreasonable application of clearly established federal law for the Connecticut Supreme Court to decline to find that the identification procedures were unnecessarily suggestive simply because police presented the witnesses with simultaneous photo arrays that were not double-blind.

Like the Connecticut Supreme Court, this Court acknowledges the impropriety of the lead investigator's statements to Clement that he "did good because that was the same guy [Valle] picked," *Marquez*, 967 A.2d at 79. The Second Circuit has held that "[a]n otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents." *United States v. Thai*, 29 F.3d 785, 810 (2d Cir. 1994), *cert. denied Tran v. United States*, 513 U.S. 977 (1994) (citing *United States v. Jarvis*, 560 F.2d 494, 500 (2d Cir. 1977)); *see also Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981) (citing *Simmons*, 390 U.S. at 383, for the proposition that "while a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through" suggestive police behavior). For instance, "[c]onduct such as . . . endorsing the correctness of the selection, 'may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves.'" *Thai*, 29 F.3d at 810 (internal citations omitted). But if the original identification was "strong and unequivocal," the "misguided post[-]identification remarks or actions" will neither "render [the identification] invalid" *nor*

"preclude a subsequent in-court identification." *Id.*   Thus, the Connecticut Supreme Court's statement that the detective's comment to Clement was "irrelevant" to its "analysis regarding the suggestiveness of the procedure itself," *Marquez*, 967 A.2d at 83, does not entirely square with the Second Circuit's interpretation of relevant U.S. Supreme Court precedent, as the Second Circuit considers post-identification remarks to be relevant to the admissibility of *both* the original identification and any later in-court identification.

In applying U.S. Supreme Court precedent, however, the Second Circuit has also held that "[w]hether the practice of telling potential witnesses of the correctness or incorrectness of pre-trial identifications has created 'a very substantial likelihood of irreparable misidentification' depends on how it is done." *United States v. Moskowitz*, 581 F.2d 14, 20 (2d Cir. 1978).   In *Thai*, for instance, the Second Circuit upheld the admission of identification testimony despite an officer's post-identification complimentary remarks because the district court had "concluded that there were . . . independent bases for each identification," given that "each witness had had an adequate opportunity to view the robbers and had paid attention to the events."   29 F.3d at 810; *see also Moskowitz*, 581 F.2d at 20 (where witness, among other things, "had an excellent opportunity to observe" the defendant on the day of the crime, selected the defendant from a photo spread less than a week after the robbery, and was certain of her in-court identification, identification process in which witness was told that she had previously identified the incorrect individual and that other witnesses had selected the "correct" individual was not impermissibly suggestive); *Jarvis*, 560 F.2d at 500 (where FBI employed practice of informing potential witnesses of the "correctness" or "incorrectness" of their pretrial identifications, trial court's decision to admit eyewitness identifications did not constitute reversible error, in part because the case did not "rest exclusively on identification testimony").   Moreover, as noted, "whether an identification procedure violates

due process is governed by an extraordinarily general standard," and the Court must allow the state court "significant 'leeway'" in reviewing the state court's application of this fact-dependent standard. *See Brisco*, 565 F.3d at 90.

Notwithstanding the improper statement of the lead investigator, this Court cannot find that the Connecticut Supreme Court's decision was objectively unreasonable, particularly in light of the significant deference owed that court in assessing a § 2254 petition. As discussed above, the Connecticut Supreme Court weighed several factors—including the warnings presented to the witnesses, the appearance of the photographic arrays, and the officers' presentation of the photographic arrays—in reaching the conclusion that the identification procedures were not unnecessarily suggestive. A federal court applying the law of the Second Circuit would likely have weighed the officer's confirmatory remark to Clement when examining the procedure's suggestiveness. However, even if the Connecticut Supreme Court *had* taken it into account, federal law does not mandate that the statement warrants a finding of impermissible suggestiveness. Rather, given the other factors that the state court appropriately weighed, the Court cannot find that the state court reached an objectively unreasonable conclusion under federal law.

For these reasons, the Court denies the petition insofar as it requests habeas relief on the ground that the eyewitness identification procedures employed in this case, as well as the denial of Petitioner's motion to suppress evidence of eyewitness identifications, violated Petitioner's due process rights.

## IV.    SECOND CLAIM:  POTENTIAL *BRADY* VIOLATION

The Court next rejects Petitioner's contention that he is entitled to habeas relief because the State improperly failed to disclose a leniency agreement between the State and cooperating

witness Edwin Soler, and because the State failed to correct Soler's false testimony at Petitioner's criminal trial that no such agreement existed.  Thus, for the reasons below, Petitioner's request for habeas relief with respect to this claim is denied.

A.  Legal Standard

The Fourteenth Amendment provides, in pertinent part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Pursuant to the U.S. Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Thus, "[t]o the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant."  *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (cleaned up) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

The government's disclosure obligation includes "not only evidence that is exculpatory, *i.e.,* going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."  *Avellino*, 136 F.3d at 255.  Thus, "[u]nder *Brady* and its progeny, the government has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant either because it is exculpatory or because it can serve to impeach a key witness."  *Shabazz v. Artuz*, 336 F.3d 154, 161–62 (2d Cir. 2003) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  Impeachment evidence includes promises that the prosecution

makes to "key witnesses in exchange for their testimony."  *Id.* at 162 (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)).

The government's *Brady* and *Giglio* obligations, however, "extend only to *material* impeachment evidence, not to evidence that is 'possibly useful to the defense' but is 'not likely to have changed the verdict.'"  *United States v. Rajaratnam*, No. 09 CR. 1184, 2010 WL 1691745, at *2 (S.D.N.Y. Apr. 27, 2010) (emphasis added) (quoting *Avellino*, 136 F.3d at 255, 257). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Avellino*, 136 F.3d at 256 (quoting *Kyles*, 514 U.S. at 433–34).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Leka*, 257 F.3d at 104 (quoting *Kyles*, 514 U.S. at 434).

In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the "only evidence linking the defendant to the crime" or the "only evidence of an essential element of the offense."  *Avellino*, 136 F.3d at 256–57.  A finding of materiality is also likely when the undisclosed evidence "would have provided the only significant basis for impeachment."  *Id.* at 257.  However, undisclosed impeachment evidence, like other *Brady* material, "is not material . . . when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'"  *Id.*  Thus, for example, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."  *Id.*

B. <u>Discussion</u>

As a preliminary matter, the parties dispute whether any leniency agreement between Soler and the State existed at the time of Petitioner's criminal trial. The Connecticut Supreme Court held, however, that even assuming the prosecution failed to disclose a leniency agreement between the State and Soler, such a failure was immaterial because it would not have affected the judgment in Petitioner's criminal trial. *See Marquez*, 198 A.3d at 565. Because the Court cannot conclude that this holding was contrary to, or an unreasonable application of, clearly established federal law, it need not decide whether a leniency agreement existed.

To begin, Petitioner does not contend that the Connecticut Supreme Court applied a rule contrary to federal law. Instead, Petitioner contends that, in examining whether the State committed a *Brady* violation, the Connecticut Supreme Court unreasonably applied federal law. As detailed below, the Connecticut Supreme Court provided several reasons why disclosure of a leniency agreement between the State and Soler, assuming one existed, would not have changed the outcome of Petitioner's criminal trial. The Court cannot conclude that this finding of immateriality was an unreasonable application of federal law.

First, the Connecticut Supreme Court noted that there was little question that Petitioner was present at the scene where the murder occurred because Petitioner admitted in a statement to police that he was present at the apartment that fateful evening and had, at some point, held the gun used in the murder. *Marquez*, 198 A.3d at 574. As a result, the court noted that the primary issue in the case was whether Petitioner participated in the robbery that led to Delgado's murder.[3]

---

[3] Under Connecticut law, "[t]here is no requirement under the felony murder statute, nor was there such a requirement under common law felony murder, that the state prove that the respondent had the general intent to commit the murders. . . . The state must simply prove all the elements of the underlying felony and then prove that the deaths were in the course of and in the furtherance of that felony, or that the deaths were caused in flight from the commission of the felony." *State v. Johnson*, 138 A.3d 1108, 1119 (Conn. App. Ct. 2016) (alteration in original).

*Id.* The court ultimately found that "[t]here was ample evidence presented at trial to show not only that the petitioner actively participated in the robbery, but that he also fired the shots that killed Delgado." *Id.*

The evidence implicating Petitioner included that Valle and Clement identified Petitioner as a participant in the robbery and/or as the gunman. *Id.* at 575–76. Valle identified Petitioner as one of the men who entered Delgado's apartment to rob the occupants, and as the man who "displayed the gun when he came into the apartment, directed Valle and the others to sit on the couch, . . . indicated that his gun was 'on safety,'" and was "struggling with Delgado when the gun went off." *Id.* at 575. After the robbery and murder, Valle "immediately recognized" Petitioner during an encounter at a parole office and recognized him again when presented with a photographic array. *Id.* The Connecticut Supreme Court found that "Valle provided strong evidence of the petitioner's guilt by identifying him during a chance encounter, selecting with certainty his photograph from an array, identifying him in court, and providing credible, corroborated testimony about the incident in question." *Id.*

Next, the Connecticut Supreme Court noted that Clement provided testimony consistent with Valle's testimony. *Id.* First, Clement confirmed that it was bright enough to see Petitioner and Soler when they were in Delgado's apartment. *Id.* Clement also testified that he looked Petitioner in the eye when the robbery was taking place. *Id.* The Connecticut Supreme Court described how Clement later identified Petitioner in a photographic array, and the court reasoned that "Clement's memory of the petitioner's facial features lends credibility to his identification, as opposed to reliance on a changeable feature, such as the petitioner's facial hair." *Id.* at 575–76. The court then noted that "[a]t the end of his testimony, Clement made an in-court identification of the petitioner as the person who was carrying the gun during the robbery." *Id.* Thus, the court

found that "both Valle and Clement presented persuasive testimony, selecting with confidence the petitioner's photograph from a photographic array, identifying him in court, and providing testimony consistent with one another's accounts of the evening." *Id.*

The court further discussed the "confession and consciousness of guilt evidence" the State provided during trial. *Id.* Specifically, Petitioner's fellow inmate, David Williams, testified that Petitioner had confessed to him that he was the one who shot Delgado that night. *Id.* Moreover, Williams testified that Petitioner suggested to him that they "each testify falsely at each other's trials." *Id.* Strikingly, Williams testified that Petitioner wrote him a letter containing a false story that reversed Petitioner's and Soler's roles in the crime and included *Soler*, rather than Petitioner, confessing to the murder to Williams in jail. *Id.* Petitioner instructed Williams to tell his own attorney about the letter, so that Williams' attorney could mention it to Petitioner's attorney, and then to destroy it. *Id.* Williams instead turned over the letter, which was entered into evidence and which "contained details largely corroborating Soler's testimony, save for the role reversal." *Id.*

Based on the foregoing, the Connecticut Supreme Court found that Soler's testimony "served only to corroborate" the independent testimony from eyewitnesses Valle and Clement; the testimony from Williams, who heard a direct confession from Petitioner himself; and Petitioner's letter attempting to frame Soler as the gunman. *Id.* The court explained that "Soler provided very little information about the incident that was not also revealed by Valle, Clement, Williams, and by the petitioner's own written words, rendering much of Soler's testimony duplicative." *Id.*

The Connecticut Supreme Court also detailed how Soler was thoroughly impeached on cross-examination. *Id.* The court explained that, although Soler did not admit that he was receiving any benefit for his testimony, he admitted "that he was hoping his attorney could do

'whatever she can do' to make him a good deal on the felony murder charge." *Id.* Soler also admitted that he did not speak to police until he was arrested because "he was hoping to get away with the crimes." *Id.* Thus, according to the court, Soler "conceded opportunistic aspirations for the disposition of his own case, regardless of whether a formal deal existed." *Id.* Notably, during cross-examination, defense counsel focused on Soler's motivation to testify consistently with the prosecution's narrative. *Id.* Defense counsel found other ways to impeach Soler as well, by highlighting Soler's drug use, his voluntary participation in the armed robbery, and the fact that his nickname was the Spanish word for "monster." *Id.* Then, during closing arguments, defense counsel told the jury that Soler "likely testified as a means to have the felony murder charge, and its mandatory minimum sentence, dropped in exchange for testimony favorable to the state." *Id.* at 576–77.

The court reasoned that "even if jurors believed Soler's allegedly false testimony that he did not have a deal with the prosecutor, their impression was harmful only to the extent that Soler's testimony provided unique value to the state's case." *Id.* at 577. The court found: "Given the testimony of Valle, Clement, Williams, and the handwritten confession evidence, we are not persuaded that Soler's testimony proved significant aside from its consistency with multiple other witnesses." *Id.* Therefore, the court concluded that, "[w]hen Soler's testimony is weighed against the overwhelming strength of the state's case, as we are obligated to do, the elevated standard for materiality is not met." *Id.* The court rejected Petitioner's arguments regarding problems surrounding the credibility of the State's other witnesses as "largely illusory." *Id.* Ultimately, the court concluded that "[g]iven how strong the state's case was, exposing Soler's motives would not have made a meaningful difference." *Id.* at 578.

The Court cannot conclude that the foregoing reasoning of the Connecticut Supreme Court, and its ultimate immateriality determination, constituted an "objectively unreasonable" application of federal law. *See LeBlanc*, 137 S. Ct. at 1728. For the Court to grant the relief Petitioner requests, the state court's decision would need to be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See id.* Given the weight of evidence against Petitioner, the Court cannot find that the Connecticut Supreme Court's immateriality determination constituted such an error.

Importantly, the allegedly suppressed evidence does not fall within the categories of impeachment evidence courts in this Circuit have considered material. Soler did not "suppl[y] the only evidence linking [Petitioner] to the crime," *see Avellino*, 136 F.3d at 256, or the only evidence of an essential element of the offense," *see id.* at 256–57. As noted, Williams, Valle, and Clement also provided evidence linking Petitioner to the robbery and the murder of Delgado. Additionally, the allegedly undisclosed leniency agreement did not provide the only significant basis for impeaching Soler. *See id.* at 257. Rather, as the Connecticut Supreme Court discussed, defense counsel impeached Soler by focusing on his drug use, his voluntary participation in the underlying armed robbery, and the fact that he was known as "Monstruo" on the streets. *Marquez*, 198 A.3d at 576.

In light of the foregoing, the evidence of the purported leniency agreement could reasonably be viewed as merely "possibly useful to the defense," but "not likely to have changed the verdict" in Petitioner's trial. *See Avellino*, 136 F.3d at 257. Likewise, it would be reasonable to conclude that the allegedly suppressed evidence "merely furnishe[d] an additional basis on which to challenge [Soler's] credibility," when Soler's credibility had "already been shown to be questionable" and when Soler had already been "subject to extensive attack by reason of other

evidence." *See id.* Accordingly, the leniency agreement could reasonably be viewed as cumulative and, hence, not material. *See id.* This is especially true in light of defense counsel's statements during summation highlighting for the jury that Soler likely testified in exchange for favorable treatment from the State regarding the felony murder charge he was facing. *Marquez*, 198 A.3d at 576–77.

The Court is not convinced by Petitioner's argument that the Connecticut Supreme Court simply assumed that there was no possibility that the allegedly suppressed evidence could have affected the jury's verdict, and that it failed to consider or address several factors bearing on the materiality of Soler's testimony, ECF No. 41 at 42. Specifically, Petitioner asserts that the Connecticut Supreme Court failed to consider that Soler was the "star" in the State's narrative and the only co-defendant and alleged accomplice in the case, who provided the jury with the full story of Petitioner's alleged criminal acts. *See* ECF No. 36 at 42–43. But the Connecticut Supreme Court discussed at length the overall strength of the State's case and how Soler's testimony factored into it. *Marquez*, 198 A.3d at 574–77. The court examined and expressly rejected Petitioner's argument that Soler's testimony significantly influenced the jury because of what Petitioner characterized as the "tenuous credibility" of the State's other witnesses. *Id.* at 577–78. More generally, as set forth above, the Connecticut Supreme Court provided several reasons why the disclosure of the allegedly suppressed evidence would not have changed the jury's verdict. The Court cannot conclude that the Connecticut Supreme Court's well-reasoned assessment of the importance of Soler's testimony to the State's case was error "beyond any possibility for fairminded disagreement," *see LeBlanc*, 137 S. Ct. at 1728.

Nor is the Court convinced by Petitioner's assertion that it was unreasonable for the Connecticut Supreme Court to conclude that Soler was "thoroughly impeached," given that Soler

denied the existence of a leniency agreement and given that the State sought to bolster Soler's credibility on redirect, *see* ECF No. 36 at 43. These arguments simply do not square with the trial record. Most notably, Soler admitted during his testimony that he was hoping for a "good deal." *Marquez*, 198 A.3d at 576. Then, during summation, defense counsel told the jurors that Soler likely testified as a way of avoiding felony murder charges. *Id.* at 576–77. Defense counsel also impeached Soler on several other bases, as discussed above. *Id.* at 576. Thus, although evidence of a leniency agreement may have been helpful to Petitioner during his criminal trial, it was reasonable for the Connecticut Supreme Court to conclude that the potential impeachment value of the alleged agreement would not have changed the outcome.

Finally, Petitioner's argument that the Connecticut Supreme Court did not properly address what he describes as the State's "affirmative solicitation of misleading testimony from Soler," ECF No. 36 at 43–44, must also fail. Specifically, Petitioner contends that, in circumstances where the State has affirmatively solicited misleading testimony, the "bar for materiality is at its very lowest." *Id.* However, the Connecticut Supreme Court expressly addressed how, "[i]n the context of a false testimony *Brady* violation, the standard for materiality is 'significantly more favorable to the defendant' than it is with other forms of exculpatory evidence." *Marquez*, 198 A.3d at 573. The court explained that "reversal is virtually automatic . . . unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (alteration in original) (emphasis omitted). This rule is consistent with the rule provided by the U.S. Supreme Court for cases in which a prosecutor knowingly fails to correct false testimony. *See Shih Wei Su v. Filion*, 335 F.3d 119, 129 (2d Cir. 2003) (applying "the test given to us by the Supreme Court, which has told us that convictions in cases of this sort must be reversed unless the evidence was so overwhelming that there is no 'reasonable likelihood

that the false testimony could have affected the judgment of the jury'") (quoting, in part, *United States v. Agurs*, 427 U.S. 97, 103 (1976)).  Applying a standard consistent with federal precedent, the Connecticut Supreme Court found that "the state's case was so overwhelming that there is no reasonable likelihood that Soler's false testimony could have affected the judgment of the jury." *Marquez*, 198 A.3d at 578.  Given the weight of the evidence against Petitioner, the Court cannot find that this determination was an unreasonable application of federal law to the facts.

Accordingly, the Court denies the petition insofar as it alleges that Petitioner is entitled to habeas relief because the State failed to disclose evidence of a purported leniency agreement between the State and Soler, and failed to correct Soler's false testimony that no such agreement existed, in violation of Petitioner's Fourteenth Amendment due process rights.

## V.      CONCLUSION

For the reasons described herein, Petitioner's request for habeas relief is DENIED in full. The Clerk is directed to enter judgment in favor of Respondent and close this case.

**SO ORDERED** at Hartford, Connecticut, this 26th day of September, 2022.


　　　　　　　　 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE